GOTTSCHALK, Appellant, vs. ZIEGLER and others, as executors, etc., Respondents.

*February 8—May 10, 1932.*

56

For the appellant there were briefs by *Rix, Barney & Kuelthau* and *Frederick W. Foote,* attorneys, and *G. Carl Kuelthau* and *Carl B. Rix* of counsel, all of Milwaukee, and oral argument by *Mr. Kuelthau* and *Mr. Rix*.

For the respondents there were briefs by *Quarles, Spence & Quarles* and *Sullivan & Sullivan,* attorneys, and *J. V. Quarles* and *Dennis M. Sullivan, Jr.* of counsel, all of Milwaukee, and oral argument by *J. V. Quarles* and *Dennis M. Sullivan, Jr.*

The following opinion was filed March 8, 1932:

NELSON, J. This action is based on fraud alleged to have been committed by the defendants while handling and distributing the estate of George Ziegler, deceased, as executors and trustees. George Ziegler, a resident of Milwaukee and a prosperous and successful candy manufacturer, died on the 24th day of February, 1904, leaving him surviving as his heirs at law and legatees under his will five sons, three of whom are the defendants herein; three daughters, one of whom is the plaintiff herein; and two grandchildren, children of a deceased daughter. George Ziegler left a last will and testament which was duly admitted to probate. At the time of his death he was the owner of 195 shares of stock of the George Ziegler Company, the par value of which was $500, and 60 shares of stock of the Duluth Candy Company, a subsidiary company, located in the city of St. Paul, Minnesota. The will required that substantially all of the estate, after the payment of funeral expenses, expenses of administration, and certain bequests to charity, etc., be held in trust for a period of five years. The defendants herein were named as executors and trustees. The will provided for the division of said estate into nine equal shares at the end of the five-year period. Thirty shares of the George Ziegler Company stock were bequeathed to each of the defendants and to another son, Theodore H. Ziegler, with the provision that if the actual value of said thirty shares of stock exceeded a one-ninth part of the estate, then each of said four sons should pay to the estate the amount of such excess, but that if the actual value of such thirty shares of stock was less than a

one-ninth part of the estate, then the executors and trustees should pay the difference to each of said four sons. The will further directed the trustees to determine the actual value of the entire estate at the end of said trust period and pay over and assign to George P. Ziegler, a son, a one-ninth part thereof. The three daughters and the two grandchildren, representing one share, were each given a one-ninth part of the testator's estate. It thus appears that, of the 195 shares of stock in the George Ziegler Company, 120 shares were specifically bequeathed, leaving 75 shares in the estate. The George Ziegler Company stock was appraised at $791 per share. At the time of the termination of the trust its book value had increased to $1,309.54 per share. The Duluth Candy Company stock was appraised at $100 per share. The 60 shares left by the deceased at the termination of the trust had increased by stock dividends to 104 shares.

At the time of the death of George Ziegler, Frank Ziegler was about forty-nine years of age, Charles Ziegler about forty years of age, and Andrew Ziegler about thirty-seven. They had all been taken into the employ of the company when they were very young and had for many years continued to assist in the upbuilding and development of the company, receiving only very modest compensation and salaries. It was generally understood in the family that when the father died the business should belong to the sons who were specifically bequeathed stock in the company. The will provided that the trustees named should serve without compensation. The trust estate seems to have been ably managed, for at the end thereof the George Ziegler Company stock had materially increased in value.

After the death of George Ziegler the will was read in the presence of the heirs and beneficiaries and copies thereof furnished them. The plaintiff claims not to have been in the room where the will was read and to have paid little attention to its reading. She admits that a copy of the will was promptly furnished to her, but claims that she never read it

but locked it up in her safe where it reposed until 1921. Annual statements of the company were mailed to the heirs. At the end of the trust period the George Ziegler Company stock was considered at its book value and on such basis each one-ninth share was. valued at $54,094.10. A large schedule, substantially two by three feet in size, was prepared, setting forth the names of the beneficiaries, the value of each share to the distributee, the amounts which had been advanced to each by deceased, and mentioned in his will; or by the trustees, the amounts of the accrued interest, etc. The plaintiff herein had received certain advancements which apparently left her entitled to the further sum of $23,990.34, which amount was paid and discharged by assigning to her twenty-six shares of the Duluth Candy Company stock at par and by giving to her notes of the George Ziegler Company for the balance. Each of the other daughters, as well as the grandchildren, received, as a part of their distributive shares, stocks in the Duluth Candy Company but no stocks in the George Ziegler Company. After each of the defendants' names on the schedule appears the amount of his share, $54,094.10, and opposite it, Geo. Ziegler Co. stocks. At the foot of the schedule is a rather long, carefully prepared typewritten approval, ratification, and confirmation of the acts and doings of the defendants as executors, "including their determination of the value of said estate for the purposes of distribution," and reciting "that the basis and plan of distribution as outlined in the schedule is satisfactory to us and each of us and may be carried out forthwith." The writing also contained the following:

"We and each of us do hereby forever release and discharge the executors," naming them, "of and from any and all claims, demands, and causes of action that we, or either of us, may have, own, or hold against them."

The instrument further approved and confirmed all accounts and reports, released each of the executors of any further liability, and consented that final judgment in said

estate be entered without notice, etc. This document was signed by all of the beneficiaries under the will, including the plaintiff, who was then about forty-eight years of age. Final judgment was shortly thereafter entered in said estate, which was approved by Frank T. Boesel as guardian *ad litem*.

It appears that upon division and distribution of the estate the 195 shares of the Ziegler Company stock were disposed of as follows: Thirty shares to each of the four sons pursuant to the terms of the will; eleven shares to each of the defendants to equalize their one-ninth shares, and fourteen shares to each of the defendants at the purchase price of $1,309.54 per share, its book value. Defendants thus took from the estate to equalize their shares and by purchase at the book value thereof the seventy-five shares of stock not specifically bequeathed to them. The plaintiff contends that the acts of the defendants in taking over the seventy-five shares of Ziegler Company stock, on the basis hereinbefore mentioned, constituted a fraud upon her from which she should be relieved and compensated according to equitable principles.

The court found the facts substantially as stated and concluded that none of the acts or omissions on the part of the defendants constituted intentional deception, fraud, or misrepresentation; that, as trustees, they were obligated in making the final distribution of the estate to distribute equal parts of the actual value of the estate among the legatees; that as trustees they were bound to be most scrupulous in seeing that the right of selection of any specific property of the estate should not be confined to the trustees themselves but should be open to all the legatees; that they had no right to purchase additional shares of stock of the corporation at a price fixed by themselves, no matter how fair they might consider it, without placing the other legatees in a position equally favorable to their own; that they were guilty of constructive fraud.

The court further concluded that the action was one solely cognizable by a court of chancery and that the cause of action did not accrue until the discovery by the plaintiff of the facts constituting fraud, but that the plaintiff's claim was barred by the statutes of limitation, sec. 330.19 (7). The court also found that, under all the circumstances, the plaintiff was guilty of laches which precluded recovery.

The plaintiff earnestly contends that the court erred in concluding that the defendants were guilty only of constructive fraud. She claims that the undisputed testimony warrants only the conclusion that the defendants were guilty of actual fraud in that they purchased from themselves, as trustees, the seventy-five shares of stock not specifically bequeathed.

In the view we take of this case, however, it is, in our opinion, wholly immaterial whether the acts complained of constituted actual or constructive fraud, since the court found that the plaintiff's action was, at the time of the commencement thereof, barred by the statutes of limitation. Although the acts of the defendants in taking over the seventy-five shares of stock amounted either to actual or constructive fraud, they certainly lacked elements of wickedness necessary to constitute moral turpitude. *Felix v. Patrick,* 145 U. S. 317, 12 Sup. Ct. 862.

On the contrary, there can be no doubt that the defendants considered themselves morally entitled to the surplus stock. They had helped from early youth to build up the business. During the many years of conservative upbuilding of the company they had made sacrifices in working for the very reasonable compensation given them. Their father had often stated that the business was to belong to the boys after his death, and it may be said that it was generally understood among all of the heirs that the defendants and Theodore were to have the business. The schedule of distribution hereinbefore mentioned showing that the defendants received

nothing but George Ziegler Company stock as their shares, that Theodore's estate received thirty shares, and that the daughters and grandchildren received none, seems quite clearly to corroborate the understanding which the defendants and some of the other heirs claimed existed at that time, that they were entitled to the stock.

This is an action in equity which seeks to vacate and set aside a final judgment of the county court of Milwaukee county entered in 1909, for an accounting by the defendants as one-time trustees and for damages. We entertain no doubt that this action is "an action for relief on the ground of fraud . . . which was, on and before the 28th day of February, A. D. 1857, cognizable solely by the court of chancery and one in which the cause of action . . . . is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud." Sec. 330.19 (7), Stats. 1927; *Pietsch v. Wegwart,* 178 Wis. 498, 190 N. W. 616.

That our statute of limitations is clearly applicable to actions both at law and in equity there can be no doubt. *Crawford County v. Iowa County,* 2 Pin. 368; *Fullerton v. Spring,* 3 Wis. 667; *Brown v. Parker,* 28 Wis. 21; *Buttles v. De Baun,* 116 Wis. 323, 93 N. W. 5; *McCann v. Welch,* 106 Wis. 142, 81 N. W. 996; *Ott v. Hood,* 152 Wis. 97, 139 N. W. 762; *Nolan v. First Nat. Bank,* 161 Wis. 22, 152 N. W. 468; *Pietsch v. Wegwart, supra.* Nor is there any question as to the imperative duty of courts to apply the statute of limitations when the facts require.

As we view the case, the controlling question is whether the plaintiff discovered the facts constituting the fraud, or had information brought home to her such as to indicate where the facts constituting the fraud could be effectually discovered upon diligent inquiry, prior to March 17, 1921, six years before the action was commenced. *O'Dell v. Burnham,* 61 Wis. 562, 21 N. W. 635. The trial court found that

the plaintiff had sufficient information no later than February 23, 1921, to enable her fully to assert her rights and that her cause of action was therefore barred by sec. 330.19 (7) of the Statutes of 1927. In the conclusion of the trial court we fully concur.

The plaintiff, however, contends that she had no actual knowledge of the alleged fraud and no sufficient information upon which to assert her rights which justified the conclusion of the trial court that she had either knowledge or information as to where the facts constituting the fraud could be effectually discovered upon diligent inquiry, prior to the year 1927 when a similar action was brought by Barbara Nolan, one of the grandchildren, and tried in the federal court for the Eastern district of Wisconsin. Such contention, in view of the evidence, seems most unreasonable. At the time of the death of George Ziegler the plaintiff was about forty-three years of age, was married, and resided with her husband, a Milwaukee business man. She was present at the house when the will was read although she claims that she was not in the immediate room where the will was read. She, however, heard it read in part. She was given a copy of the will which she claims she never read, but which was placed in a safe where it continued to repose untouched and unread until 1921. She received from time to time the annual reports of the George Ziegler Company which she claims she barely glanced at before filing them away. In 1909 she received a copy of the final report of the trustees and thereafter, together with all of the other heirs, signed the approval of the schedule of distribution and fully released the executors and trustees. She knew at that time that she was getting none of the Ziegler Company stock and knew that the defendants and Theodore were getting all of it. She admitted upon the trial that she was fully satisfied at the time with the distribution and continued to feel satisfied until early in 1921 when she learned that the defendants had given

certain of their stock in the company to their wives and daughters. On February 23, 1921, she wrote the defendants as follows:

"Dear Brothers Frank, Charles, and Andrew:

"Our father willed you each thirty (30) shares of his stock, also brother Theodore. That makes one hundred twenty (120) shares. Our father left one hundred ninety-five (195) shares, of which seventy-five (75) shares were supposed to be my sisters' and my shares according to father's will. Here is the part I am referring to in the will: 'And as inasmuch as the George Ziegler Company has been my life work and I am the principal stockholder therein, it is my desire and earnest wish that my executors and all my other children interested or to become interested in said business shall do their utmost to maintain, build up, and increase the same and preserve its good reputation, and I do expressly admonish them to be industrious, economical, and righteous towards their fellow men.' Now, dear brothers, I hope you will see the mistake you made and hope you will make it good, as I am in need of that money that I ought to be making on these shares that I am entitled to. Think of the words Jefferson said when talking about slavery: 'I tremble when I remember that God is just.' "

It is perfectly evident that, at the time she wrote that letter, she knew the number of shares of stock left by her father; she knew that one hundred twenty shares thereof were specifically bequeathed; she knew that she had received no stock and that the defendants and Theodore had received all of it; she claimed that a mistake had been made in the distribution of the estate, and that the remaining seventy-five shares were supposed to be hers and her sisters'. The conclusion is unavoidable that on February 23, 1921, she was possessed of knowledge and information amply sufficient to permit her to assert her rights. In *O'Dell v. Burnham, supra* (p. 569), it was said:

"Of course, 'the facts constituting the fraud' which, within the meaning of the statute, are thus to be discovered, have no reference to open, visible facts known to the aggrieved

party at the time, for then there would be nothing to be discovered. On the contrary, they are such facts as are not known to such aggrieved party, but known, concealed, and kept secret by the party committing the fraud. While such facts are concealed from and unknown to the aggrieved party the statute will not run against her unless she is chargeable with notice of such facts. When the information brought home to the aggrieved party is such as to indicate where the facts constituting the fraud can be effectually discovered upon diligent inquiry, it is the duty of such party to make the inquiry, and if he fails to do so within a reasonable time he is, nevertheless, chargeable with notice of all facts to which such inquiry might have led." *Ludington v. Patton,* 111 Wis. 208, 242, 86 N. W. 571.

The same general rule is stated in 37 Corp. Jur. p. 939, as follows:

"Knowledge by the defrauded party of facts which in the exercise of proper prudence and diligence would enable him to learn of the fraud is usually deemed equivalent to discovery; and therefore not only in equity but generally in those jurisdictions where the equitable rule has been made applicable to actions at law, the statute runs from the time when by the use of reasonable diligence the fraud could have been discovered. No principle is better settled in actions based upon fraud where the rights of a party are dependent upon his diligence in discovering fraud than that means of knowledge is knowledge itself; that knowledge of facts which should put a reasonable man upon inquiry invests the suitor in legal contemplation with full knowledge of all that such inquiry would have developed."

The plaintiff earnestly contends that, in spite of the foregoing, she had no knowledge of the fraud or information upon which to assert her rights prior to 1927 when the Nolan case was tried. This contention, however, seems clearly not to be supported by the evidence. In addition to the letter hereinbefore quoted, she signed and mailed to Charles I. Ziegler, one of the defendants herein, under date of April 20, 1921, a letter which had been prepared by one of her sons,

with the approval of her husband, and in which she referred to the letter written in March, to her faith and confidence in the defendants, to the recent issuance of stock to the daughters of the defendants, to the study which she had given to her father's will, to the meaning of the will, to the report of the company under date of January 1, 1909, to the shares of stock left by her father undisposed of, to the fact that she had signed the "probated statement," to the fact that she had been informed that she could take the matter into court and demand a redivision of the estate, and to her firm belief that if her father could have dictated the division of the estate she would have received eighteen shares of the company's stock and the balance of her share in cash. She closed the letter by saying: "I therefore again appeal to your sense of fairness and justice and ask a redivision of the estate along these lines before I go further in the matter." All of the foregoing facts are undisputed.

It further appears from the testimony of Charles Ziegler given at the Nolan trial, which was offered and received in evidence upon this trial, that he told his sisters before the final division of the estate that the defendants expected to take over the stock held by the estate as they felt they were entitled to it for their work in building up the business. He further testified: "We felt we were morally entitled to the stock and our sisters considered it so. It was our work and that is why we did it." "Our sisters knew what the business was doing and they were getting annual reports, and when the time came I told my sisters that we felt we were entitled to the balance of the shares of the Ziegler Company held in my father's estate." The plaintiff herself testified that she would not have had any objection to the manner of the distribution of the estate if only men had been permitted to hold stock in the Ziegler Company. "The thing that made the whole trouble here was when some of the women in the family were given stock. If they had not been given stock

at that time I would never have made any objection to the distribution of the estate because I would not have known that I could make such objection. My complaint was that the women in Andy's, Frank's, and Charles's family were given stocks in the Ziegler Company in 1921 and I didn't get any." There is testimony to the effect, although disputed by the plaintiff, that as early as November, 1913, she told her brother Andrew that Frank cheated her out of stocks in the Ziegler Company; that he cheated her out of her rightful share of stock; that she and her sisters had a right to that stock as their father meant to give it to them; that in 1914 she told her brother George that she was not satisfied or pleased with the execution of the will; that in the fall of 1916 she told her sister, Mrs. Verhalen, that she should have had some shares of stock; that her son Telesphor had read the will and had told her that she should have had stocks in the company; that she complained to her intimate friend, Mary Wieser, about the stock and stated that her brothers were nothing but crooks, that they had taken the cream of everything and that she had to take what was left; that early in January, 1921, after learning that certain stock had been given to the daughters of the defendants, she called her brother Charles Ziegler to her home where a stormy discussion took place between them. Just what was said at this discussion was not received in evidence, but it did appear that when it was over Charles was greatly hurt and severed friendly relations with the plaintiff. The witness Mary Wieser, above mentioned, testified that the plaintiff told her that she was so provoked about the matter that she called Charles to her house and "called him names and everything else;" that she was so worked up about it that she called him a crook. Mrs. Verhalen, a sister, also testified that in February, 1921, she received a letter from the plaintiff written by a daughter of the latter in which it was claimed that the daughters were entitled to stock in the Ziegler Company and

that Mrs. Verhalen should at least get her share of the stock for her daughters' sake. Claudia Verhalen, a niece of the plaintiff, testified that the plaintiff expressed her dissatisfaction regarding the stock as early as 1916. There was other testimony along the same line which need not be mentioned.

We conclude that the finding of the trial court as to plaintiff's knowledge and information as to the alleged fraud, prior to February 23, 1921, is amply supported by the evidence.

A reading of the plaintiff's testimony reveals a rather studied attempt to create the impression that she was wholly ignorant in business affairs; that reports and figures were meaningless to her; that she had a perfectly childlike trust and confidence in her brothers; that she refused to entertain any thought of having been defrauded; that she would not permit the members of her family to discuss with her the possibility of any unjust or unfair treatment of her. Over and over again she expressed her faith and trust and confidence in her brothers. She expressed such confidence so often throughout her testimony as to give rise to a feeling that she was fully advised as to the facts and the law which ruled the decision in the Nolan case. There is testimony which supports the conclusion that Frank Ziegler was not on speaking terms with the plaintiff at the time of the settlement of the estate; that Andrew Ziegler terminated friendly relations with her in 1913, and that Charles Ziegler had no friendly relations with her after the interview early in 1921.

The court below seems to have given the whole case most careful consideration; to have freely consulted the transcript of the testimony while drafting his decision and to have given generous response to the contentions made in the brief. Under the well established law the findings of the trial court will not be disturbed unless they are against the clear preponderance of the evidence.

Great reliance is placed by plaintiff on *Michoud v. Girod*, 4 How. (45 U. S.) 503. We do not think this case is con-

trolling. *Michoud v. Girod* was decided in 1846 and involved the purchase by the executors, through another, at a judicial sale, of all of the properties constituting a large estate. The complaining heirs therein evidently knew nothing of the fraud and had little opportunity to hear of it, as they resided "far distant from the scene of the transactions" of which they complained and had no sufficient knowledge upon which to act. Many of the heirs resided in France. The case arose early in the nineteenth century, at a time when communication and travel were slow, unsatisfactory, and hazardous. In that case the court held, under all of the circumstances, that the complainants were not guilty of laches. Obviously no statute of limitations similar to ours was therein involved.

The plaintiff also earnestly contends that the statute of limitations does not operate to bar a *cestui que trust* from asserting his rights against a trustee of an express trust unless the period of limitation has run after a repudiation of the trust. *Williams v. Williams,* 82 Wis. 393, 399, 52 N. W. 429; *McClear v. Root,* 147 Wis. 60, 132 N. W. 539; *Taylor v. Hill,* 86 Wis. 99, 106, 56 N. W. 738.

This is undoubtedly the law, but it does not avail the plaintiff anything in the action, since more than six years elapsed, after repudiation of the trust had been brought home to the plaintiff, before she commenced her action. *Buttles v. De Baun, supra.*

Since the facts as found by the trial court cannot be disturbed, and since the statute of limitations cannot be ignored, we have no alternative but to affirm the judgment.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on May 10, 1932.