IHLENFELD, Appellant, vs. SEYLER and others, Respondents.

*November 6—December 3, 1940.*

For the appellant there was a brief by *Spence & Hanley*, attorneys, and *Arthur T. Spence* of counsel, all of Milwaukee, and oral argument by *Arthur T. Spence*.

For the respondents there was a brief by *George H. Seefeld*, attorney for Charles F. Jacobson, *Alvin Gloyeck, Jr.*, attorney for Frank Zajec, and *Rudolph W. Talsky*, attorney for Herbert F. Wilde, all of Milwaukee, and oral argument by *Mr. Gloyeck* and *Mr. Talsky*.

WICKHEM, J. The nature of this controversy will require a statement in some detail of the facts involved. However, it will be useful at the outset to state that it is not questioned that a gross fraud was perpetrated upon plaintiff although there are conflicting contentions as to the respective parts and consequent liability of the several defendants joined. The grounds upon which the nonsuit was granted were that the representations were of such a character that plaintiff was not entitled to rely upon them, and that, in any event, the statute of limitations had barred plaintiff because she discovered the fraud more than six years before her action was brought. The appeal turns upon the correctness of these conclusions.

Plaintiff invested the sum of $2,580 in a series of promissory notes. These investments were in some oil enterprises conducted by defendant Seyler, who was a promoter. Defendant Wilde was plaintiff's brother-in-law, and she lived in his home during the years 1928, 1929, and 1930. Defendants Jacobson and Zajec were strangers to plaintiff.

During the years 1922 and 1923 plaintiff, who was a book-keeper with a grade-school education, plus attendance at a school of business, evening high school, and university extension classes, had invested $20 in stock of the M. T. C. and Elbukan Oil & Refining Company, which was operated by Seyler. Shortly after the investment these companies ceased to sell stock and pay dividends, but plaintiff continued to receive circulars and other literature concerning them. In September, 1929, plaintiff talked to Wilde, who told her that Seyler had organized a new company and was in a position to make some money for his investors. Seyler's proposition was that investors take his own personal notes for the money invested, receiving as a bonus stock in the Invincible Oil & Refining Company, a recently organized company, which was the holder in one form or another of valuable properties. Based on the par value of the stock this was a bonus of four hundred per cent. About February 25th, plaintiff invested $250 in one of these notes, paying the money to defendant Jacobson, who told her that the note was secure, but that Mr. Seyler was not in a position to give security because the railroad commission would not permit it. He also told plaintiff that Seyler had valuable properties, that they had struck oil, but that the principal well was capped for the time being. It was stated that the note would be paid in ninety days, but plaintiff discovered when she received it that it was payable in a year. Plaintiff was assured by Wilde that she was not throwing good money after bad and would never need to work after the project was on its feet. Jacobson told her the same thing. Several weeks after receiving the note plaintiff again had a con-ference with Wilde with respect to a new financing project of Seyler. It was explained to plaintiff that Seyler had an oil well with leases around it and by starting to drill under these leases he could force surrounding companies to buy the property at a huge profit to him and to those who

would loan money on the notes. Wilde asked plaintiff to loan money on this proposition and she actually did put in some more money. On this occasion Jacobson told her that she would make up the $2,500 that she had lost and would have the principal back within ninety days. The evidence does not disclose where the $2,500 was lost. It was also intimated that she would have a fine position as Mr. Seyler's secretary. She got a receipt for this investment of $500. She was later invited to attend a meeting at the Milwaukee Auditorium at which time Mr. Seyler was present and asked that the most recent investment be transferred to applications for unsecured notes. The investors there present were told that the railroad commission would not allow him to give security for the notes, but that each would receive a four hundred per cent bonus in Invincible stock. In the early part of November, 1929, plaintiff again attended a meeting at the Milwaukee Auditorium in common with other investors in the Seyler enterprise. It was represented at the meeting that Seyler needed more money to finance work on a well which had produced some oil. Further investment in unsecured notes was solicited, and it was again stated that the railroad commission did not permit the issuance of secured notes. Similar statements were made by Jacobson and Wilde, and plaintiff had confidence in their statements. At this meeting Seyler stated that plaintiff would receive a one hundred per cent lease bonus in the Producer's Exploration Company and also a bonus in the form of Invincible stock. Jacobson stated that the lease bonus would net large profits because they were valuable leases worth as much as $1,000 an acre. At this meeting lantern slides of the oil fields were exhibited. Another meeting was held in Milwaukee, and it was announced that the last meeting did not result in quite as much money as expected, and a plea for more money to go on with the work on the well was made. In response to each of these meetings plaintiff made

further investments and received bonuses for portions of the investment. Up to this point plaintiff had parted with $1,100. In April, 1930, Wilde told plaintiff that Seyler had been having some difficulty with the railroad commission; that the latter was persecuting Seyler, but that they could not prosecute him because he had done nothing wrong; and that they were persecuting him because big interests were after Seyler. In April, 1930, plaintiff attended a meeting of other holders of the old M. T. C. and Elbukan Oil & Refining Company stock. Defendants Edward Donahue and Jacobson were at this meeting. Much criticism of the railroad commission and the Milwaukee Journal was indulged in because of the claim that they were persecuting Seyler, when in fact he had done nothing wrong. Donations were asked to take care of immediate expenses of Seyler and Jacobson, the noteholders were organized, and plaintiff at that time donated $10. At that time Donahue stated that it would be foolish not to stand by Seyler. Another meeting of the M. T. C. noteholders was held on May 9, 1930. The meeting was called by defendant Emily Donahue, and Zajec, Wilde, and Mr. and Mrs. Donahue attended. Representations that the railroad commission was unjustifiably causing Seyler trouble, and that the big interests influenced the commission to persecute Seyler were repeated, as well as criticism of the Milwaukee Journal, which had continued to publish statements exposing the Seyler activities. It was represented that arrangements had been made between the Wm. Seyler Company and Mr. Zajec to offer a trustee note secured by liens on all property of the Seyler Company and oil equipment, and that if Seyler did not pay, Zajec would foreclose on that. It was stated that inasmuch as the giving of a stock bonus had been construed by the railroad commission as an indirect sale of the stock, Seyler was unable to offer the four hundred per cent bonus in the Invincible Oil & Refining Company, but that if he took the investors

to Waukegan he could give them this bonus because the Illinois law did not prevent this transaction. At this meeting defendant Edward Donahue repeated his statements that it would be foolish not to stick by Seyler, especially since Zajec, as trustee, could foreclose if Seyler could not pay. Further investments were made by plaintiff as a result of this meeting, plaintiff believing that the trustee notes were legally secured. In July, 1930, plaintiff invested the further sum of $1,000 in these trustee notes. This was the result of a meeting which Wilde and another invited her to attend. Seyler was at this meeting. It was stated that the railroad commission had interfered with the sale of unsecured non-negotiable notes, and that as a result he had arranged to offer trustee notes. The purpose of the issue was to have more money for the development of the well heretofore mentioned. Zajec also spoke at this meeting and assured the investors that the trustee notes were well secured and if not paid that he would foreclose the security. Another meeting in July of 1930 was held attended by Seyler, Zajec, and Wilde. Representations as to the adequacy of the security were repeated. On July 23, 1930, plaintiff made an accommodation note for $100 to further assist Seyler because of his inability to raise more funds on the trustee's notes. Seyler stated that he was able to borrow $10,000 from a man in Chicago provided the noteholders would be responsible for it, and that none of the accommodation makers would ever have to meet more than one fourth of the notes signed. Demands were ultimately made on plaintiff for the balance of $75 on this note, and she settled for $50. On March 6, 1931, plaintiff invested another $100 on representations of Wilde that Seyler was almost through with his work but needed just a little more money, and that for this investment she would receive a trustee's note. The Donahues advised her to chip in and help, and that it would be foolish with things so nearly finished to abandon the matter.

The usual bonus of Invincible stock was again offered. In September, 1931, plaintiff purchased another $75 trustee note, as a result of a meeting early in the month. During all this period plaintiff never had any returns either in interest or dividends from any of these investments. During all this time she claims to have had confidence in Seyler, Zajec, Wilde, the Donahues, and Jacobson. She states:

"So far as I knew until the latter part of 1931 there was no reason to distrust them. I became suspicious for the first time after I paid in the $75 in August, 1931. Everything was supposed to be over September 1st or October 1st. . . . When nothing materialized, I started questioning Mr. Wilde and his answers were so evasive and unsatisfactory that it made me feel peculiar. . . . I kept asking Mr. Wilde if I was not going to get my money. He would not make any statement at all, and in 1932, I wrote Mr. Seyler in New York and asked him for my money. He replied with all kinds of excuses but no money."

By 1934 plaintiff's distrust took the form of complaints to the public service commission, and in August of 1934 the legal adviser of the commission told her that no transaction after March 1, 1930, could possibly be legal. Plaintiff claims that that is the first time that she had learned anything to indicate that false statements had been made to her.

Upon this evidence the contentions are made, (1) that considering plaintiff's education, experience, and intelligence, she had no right to rely upon the representations made, and (2) that in any event she discovered the fraud more than six years prior to the commencement of this action, and the latter is barred by the statute of limitations. Since we deem the second point well taken, it is unnecessary to deal with the very doubtful questions involved in the first.

Sec. 330.19 (7), Stats., provides:

"330.19 *Within six years; foreign limitation; notice of injury.* Within six years: . . .

"(7) An action for relief on the ground of fraud. The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud."

Prior to 1929, the act read as follows:

"An action for relief on the ground of fraud in a case which was, on and before the 28th day of February, A. D. 1857, cognizable solely by the court of chancery. The cause of action in such case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud."

It will be noted that in sub. (7) of sec. 330.19, Stats., as now in force, the legislature has dropped the requirement that the action for relief shall have been cognizable solely by the court of chancery on or before February 28, 1857. It thus applies both to actions for deceit and to equitable actions for relief upon the ground of fraud. Hence, plaintiff's claim did not accrue until she discovered the facts constituting fraud.

*Thom v. Sensenbrenner*, 211 Wis. 208, 211, 247 N. W. 870, points out that this amendment destroys the distinction between actions at law and suits in equity, and that "since that enactment and by virtue thereof, actions at law, as well as in equity, for relief on the ground of fraud, which had not theretofore accrued, as well as causes of action, which formerly were cognizable solely in courts of equity, are not deemed to have accrued until the discovery of the fraud."

Under this statute and the rule of the *Thom Case, supra,* the trial court correctly held that any cause of action arising out of plaintiff's first payment of $250 on or about February 25, 1929, is outlawed since this occurred before the enactment of the statute and her cause of action accrued at the time of payment.

As to the rest of the transactions, the question is when, in legal contemplation, plaintiff discovered the fraud. In

*O'Dell v. Burnham,* 61 Wis. 562, 569, 21 N. W. 635, it was stated:

"When the information brought home to the aggrieved party is such as to indicate where the facts constituting the fraud can be effectually discovered upon diligent inquiry, it is the duty of such party to make the inquiry, and if he fails to do so within a reasonable time he is, nevertheless, chargeable with notice of all facts to which such inquiry might have led."

To the same effect see *Gottschalk v. Ziegler,* 208 Wis. 55, 241 N. W. 715.

Plaintiff concedes that in August, 1931, she became suspicious of the transaction and distrustful of defendants. All expenditures for development were to be over in September or October of that year, and returns from the project were to begin. She received answers to inquiries addressed to Wilde that were so evasive as to make her "feel peculiar." She knew that the railroad commission and the Milwaukee Journal had both addressed themselves to the merits of these enterprises and might have information which was valuable to her. In 1934 she did go to the public service commission and at once received information that convinced her that a fraud had been perpetrated. This action was not commenced until November 6, 1938. We consider that prior to November 6, 1932, plaintiff had knowledge and information of facts leading her to suspect fraud and knowledge of where to go to ascertain the facts. Under the rule of the *O'Dell Case, supra,* this constituted discovery of the fraud. Under these circumstances, her claim is barred by the terms of sec. 330.19 (7), Stats., because not brought within six years of the discovery of the facts constituting the fraud.

*By the Court.*—Judgment affirmed.